# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00761-CV

## In the Matter of B. K. A., Jr., a Minor

### FROM THE 424TH DISTRICT COURT OF BURNET COUNTY
### NO. 49633, THE HONORABLE EVAN C. STUBBS, JUDGE PRESIDING

## MEMORANDUM OPINION

Appellant B.K.A., Jr., a Minor ("Billy"), appeals from the trial court's order requiring him to register publicly as a sex offender.[1] In a single issue on appeal, Billy asserts that the evidence is insufficient to support the trial court's finding that he should register publicly as a sex offender. We will affirm the trial court's order.

### BACKGROUND

Billy was born in 2004. In 2019, the trial court adjudicated him delinquent for committing the offenses of aggravated sexual assault of a child and indecency with a child by contact. The trial court placed Billy on probation for 24 months and deferred its decision on whether Billy should be required to register as a sex offender "until [Billy] has completed a sex-offender treatment program as a condition of probation."

In 2021, the State filed a motion to modify Billy's probation after being informed by Billy's treatment provider that Billy most likely would not have enough time to complete his

---

[1] We refer to appellant using a pseudonym to protect his identity. *See* Tex. R. App. P. 9.8(c)(2).

treatment prior to the end of his probation term. The State asked that Billy's probation be extended to October 11, 2022, Billy's 18th birthday, and the trial court granted the State's motion. In May 2022, the trial court again modified Billy's probation, transferring him to a different sex-offender treatment provider for the remainder of his probation.

Upon completion of Billy's probation, the State filed a motion to determine sex offender registration, asking that Billy be required to register non-publicly as a sex offender and indicating that Billy did not oppose the request. Billy filed a response, stating that although he had originally agreed to the State's motion for non-public registration, he now sought exemption from registration altogether because he had successfully completed sex-offender treatment. Following a hearing at which several witnesses testified, the trial court ordered that Billy be required to register publicly as a sex offender. This appeal followed.

**GOVERNING LAW AND STANDARD OF REVIEW**

When a juvenile is adjudicated delinquent for a sex offense, the Code of Criminal Procedure authorizes trial courts to require the juvenile to register as a sex offender. *See* Tex. Code Crim. Proc. art. 62.051(a) (generally requiring sex-offender registration of any "person who has a reportable conviction or adjudication"); *see also id*. art. 62.001(5) (defining "reportable conviction or adjudication" to include offenses of aggravated sexual assault and indecency with child). Upon adjudication, the trial court may require registration, exempt the juvenile from registration, or defer a decision as to whether registration is required. *See id*. art. 62.352(a), (b).

When a trial court defers its decision on whether to require registration as a sex offender, as it did here, the trial court "retains discretion and jurisdiction to require, or exempt

2

the respondent from, registration under this chapter at any time during the treatment or on the successful or unsuccessful completion of treatment, except that during the period of deferral, registration may not be required." *Id.* art. 62.352(c). "Following successful completion of treatment, the [juvenile] is exempted from registration under this chapter unless a hearing under this subchapter is held on motion of the prosecuting attorney . . . and the court determines the interests of the public require registration." *Id.* Registration may be either public or non-public. *See id.* art. 62.352(b), (c). When registration is non-public, the registration information "may not be posted on the Internet or released to the public," *id.* art. 62.352(d), and "is restricted to use by law enforcement and criminal justice agencies, the Council on Sex Offender Treatment, and public or private institutions of higher education," *id.* art. 62.352(b).

We review the trial court's decision on registration for abuse of discretion. *See id.* art. 62.357(b); *In re R.A.*, 465 S.W.3d 728, 740 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). "Generally, the test for abuse of discretion is whether the trial court acted without reference to any guiding rules and principles or whether the trial court acted arbitrarily or unreasonably." *In re R.A.*, 465 S.W.3d at 742 (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)). Under this standard, "legal and factual insufficiency are not independent grounds of error, but rather are relevant factors in assessing whether the trial court abused its discretion." *Id.* (citing *Baltzer v. Medina*, 240 S.W.3d 469, 475 (Tex. App.—Houston [14th Dist.] 2007, no pet.)). The trial court does not abuse its discretion "as long as some evidence of a substantive and probative character exists to support the trial court's decision." *Id.*

## DISCUSSION

In his sole issue on appeal, Billy asserts that the evidence is legally and factually insufficient to support the trial court's finding that he should be required to register publicly as a sex offender. Although he does not dispute on appeal that he should be required to register, he contends that his registration should be non-public.

### Evidence presented

The evidence presented at the hearing to determine sex-offender registration included the testimony of Dr. Shelley Graham, who performed a psychosexual evaluation on Billy in April 2022; Melody LeVane, a therapist and treatment director at Brookhaven Youth Ranch, the first facility where Billy received sex-offender treatment; Terri Werner, a therapist and sex-offender treatment provider at Pegasus Schools, Inc., the second facility where Billy received sex-offender treatment; Annette Robbins, the sex offender supervision officer for the juvenile probation department in Burnet County, who supervised Billy's probation; and Rafael Tovar, a Child Protective Services caseworker who worked with Billy for several months toward the end of his probation.

Documentary evidence admitted at the hearing included a copy of Dr. Graham's psychosexual evaluation report on Billy, which provided extensive information on Billy's history, including the following details regarding his delinquent conduct:

> Per the Brookhaven Youth Ranch Treatment Review, [Billy's] sister made an outcry of sexual abuse, stating that [Billy], who was 14 at the time, had repeatedly sexually assaulted her and other family members. The victim stated that the abuse had started when she was 4 years old and [Billy] was 5. The records note that at the time of his admittance into Brookhaven Youth Ranch, he had 4 felony charges for Sexual Assault. [Billy] reported that he began engaging in sexual acts with his sisters and cousins starting at age 5 or 6 years and ending at 14 years of age. He

reported to the examiner that the assaults included sexual intercourse as well as sexual touching. He identified the victims as his sisters and cousins, noting that he primarily targeted female relatives but additionally engaged in sexual acts with male cousins. . . . Billy reported that at this time, he is only facing two felony charges as the other two were dropped.

The report went on to state that Billy admitted to engaging in various other bad behaviors during his childhood, including fighting, trespassing, starting fires, sexual deviance, hurting animals, and engaging in sexual acts with an animal. He had a history of neglect and "anger outbursts," had made "threats of self-harm" when he was younger, and had received diagnoses of schizophrenia, psychotic disorder, and conduct disorder. Brookhaven treatment records "noted instances of sexual advances or physical assaults towards peers, as well as theft," "rule-violating behavior," and "property destruction." Incident reports from Brookhaven also indicated that "[Billy] would target students whom he perceived as weaker, when he first entered into the program, coercing them into sexual favors for protection."

Other comments in the report were favorable to Billy. He "was given the Hanson Sex Attitudes Questionnaire to assess for possible cognitive distortions regarding sexual behaviors. Within the assessment, [Billy] endorsed healthy attitudes about sex. Nothing of concern was noted within his responses." Billy also exhibited above-average intellectual functioning and appeared "open to treatment modalities and endors[ed] the value of personal change and personal responsibility." Moreover, "[t]here were no significant concerns reported with unusual thoughts, problems with empathy, undue suspiciousness, extreme moodiness, unhappiness, elevated mood, anxiety, or physical health concerns." Additionally, "there were no reported concerns with alcohol or drug abuse."

5

However, the report further indicated that Billy was at high risk of re-offending. The tool that Dr. Graham used for evaluating Billy's risk of re-offending was the Juvenile Sex Offender Assessment Protocol-II (J-SOAP-II). Based on the results of the J-SOAP-II, Billy scored high on both the sex and violence scales, which meant that Billy "may well require more intensive supervision in a highly structured environment" and "would benefit from sex-offense specific treatment as well as delinquency-focused interventions." Dr. Graham concluded in her report that Billy's J-SOAP-II "indicate[s] high risk for recidivism of sexual offending and other behaviors."

During her testimony, Dr Graham explained the results of her evaluation in more detail. She testified that "if someone has thoughts or any sort of fantasy, visualization that includes violence, that is seen to be a more significant finding because that can be more dangerous to the community potentially." Scoring high in both sex and violence, as Billy did, indicated to Graham that "in some of his fantasies or thought processes," "he did include violence at times in part of his imaginings." She added, "[W]hen you pair those two things together, the sexual and the violence, that's a potentially dangerous combination."

When asked to provide a recommendation regarding registration in this case, Dr. Graham testified that "public registration does not necessarily show to be effective in the literature, but what it does is it provides a scenario where someone might be held accountable by thinking that they know that there is going to be some oversight." She explained that she has "a long record . . . of not recommending that there be . . . a need to register for a juvenile," but that "in this instance I feel like [Billy] still needs more [treatment]. And so from that perspective and being the age he is and what is left for him to do, it would seem that the registry would be something that would allow some oversight in the community regarding what his behaviors

6

might be." She added that registration could be non-public but that "if [Billy] does not have any other means to have more treatment to help him, then public registry might allow the public to be more safe in some ways," even though in her view, "the research does not bear out that that's accurate."

Annette Robbins, the sex offender supervision officer for the juvenile probation department in Burnet County, testified that she had been working with Billy since the case began. Robbins explained that she communicated monthly with Billy over the phone and maintained contact with his treatment providers, receiving monthly reports on Billy's treatment. Robbins testified that Billy had "minimal participation" in treatment at the beginning of the case and was "not really participating in the treatment program like he should." Robbins explained that at the end of Billy's time at Brookhaven, "he started picking up the pace a little bit" and "was doing better at the end," but in her opinion "he still . . . had a lot of work to do." Robbins drew a "distinction between completing the program, going through the process and checking the boxes, and actually engaging and successfully learning and incorporating what's taught." Robbins did not believe that Billy had successfully completed treatment at Brookhaven "[b]ecause he continued to disclose deviant sexual fantasies of his victim repeatedly on numerous occasions." In her view, "when you continue to have those things, those thoughts, I don't think that you successfully complete[d]."

Robbins testified that Billy "did okay" at Pegasus, the second facility where he received treatment. "[T]here [were] not really a whole lot of incident reports" at Pegasus, although there were "some power struggles and some inappropriate conversation" between Billy and staff members at the facility. Also, Billy made "significant disclosures" while at the facility that concerned Robbins. These disclosures included "having deviant sexual fantasies of . . . one

7

of his victims" and "having deviant sexual fantasies of raping one of the Pegasus staff members while his peers at Pegasus were onlooking and cheering him on." Based on these disclosures, Robbins recommended that Billy register publicly. Robbins explained that recommending public registration was not her standard practice and that she had recommended public registration less than ten times in the over 100 cases she had supervised.

Melody LeVane, Billy's therapist at Brookhaven, testified that when Billy was first admitted to the facility, he made numerous admissions of deviant sexual behavior, including that he had groomed three children for sexual activities, physically forced one child into sexual activity, found child pornography, had sex with an animal, masturbated in public on numerous occasions, had sexual contact with someone who was sleeping on two occasions, tortured animals approximately 30 times by hitting them, sexually fondled a friend who fondled him in return, and regularly fantasized and masturbated to thoughts of his victims.

LeVane testified that Billy's issues were discussed during his therapy and that Billy "completed the required assignments and he showed considerable improvement in all of the domains that we're looking for," including "demonstrat[ing] a lot of understanding and empathy" and "tremendous" social improvement and engagement. LeVane believed that by the time Billy left Brookhaven, he had successfully completed their sex-offender program, although she clarified that "[t]o successfully complete our program does not mean the same thing as to successfully complete all of the requirements." Rather, "he completed what [LeVane] believed he could complete with us." LeVane acknowledged that Billy had not been entirely successful at Brookhaven. Specifically, Billy "was struggling with abiding by the rules of pornography," which he had "periodically accessed" while at the facility, including by persuading a staff

8

member to give him her phone. LeVane testified that she was generally opposed to public registration "for kids" and recommended that Billy not be required to register publicly.

Terri Werner, Billy's therapist at Pegasus, testified that Billy "showed remorse" for his past sexual behaviors and "talked about, you know, not wanting to do those things again." However, she added that Pegasus did not "really have any sort of evidence as to how he would do unsupervised in the community because he hadn't been" unsupervised before, so they "talked a lot about that and, like, what would be some risk factors for [Billy]," and Werner "felt like he was able to identify those." Werner testified that concerns arose after Billy "disclosed some sexual fantasies that involved raping a female staff member where peers were around to kind of cheer him on" and "said that he fantasized about one of the victims, who, from what I understand, was a cousin." As a result of those disclosures, Werner recommended that Billy register. She explained,

> I feel like after three and a half years of treatment at Brookhaven and the four months that he did treatment at Pegasus one of the main things we focus on is changing deviant thoughts to something more positive and I didn't see that that had happened. I feel like there is—you know, there's really not an opportunity for me to see how he's going to do in an unsupervised environment, so I feel like there needs to be some form of monitoring.

When asked if she agreed or disagreed that registration was beneficial, Werner testified,

> I really can't say for sure if I agree or disagree. I'm sure that that's accurate. I agree that he should be registered. I don't think it needs to be public. I think that public registration probably does cause stress, but I also think that probation causes stress. I mean, but there's a reason for it and I think the main reason that I recommend it is so that there will be someone to monitor him and hold him accountable until he can show how he's going to do in an unsupervised environment.

9

In her clinical discharge summary, a copy of which was admitted into evidence, Werner wrote that Billy "showed that he could keep himself and others safe in a highly supervised environment, but it is difficult to determine if he will do so when he transitions back into the community."

Rafael Tovar, Billy's CPS caseworker, testified that "[s]ex offender registration would essentially bar [Billy] from all supervised extended living programs or transitional living programs," regardless of whether registration was public or nonpublic. In Tovar's opinion, registration would be detrimental to Billy because it would adversely affect his access to CPS resources.

Also admitted into evidence were emails from Billy's treatment providers in which they summarized Billy's progress in treatment and copies of protective orders prohibiting Billy from, among other things, having contact with or communicating with his victims until 2042. Billy's attorney ad litem testified that Billy had agreed to the protective orders.

**Analysis**

In arguing that the evidence is insufficient to support the trial court's decision to have Billy register publicly as a sex offender, Billy emphasizes the testimony of LeVane, who recommended that Billy not be required to register publicly; Werner, who testified that she did not think Billy needed to be registered publicly; and Dr. Graham, who testified that "public registration does not necessarily show to be effective in the literature" and indicated that although she believed Billy should register, she believed it could be non-public. Billy also points to evidence showing that public registration would be stressful to him and would limit his access

10

to community resources. Finally, he claims that the protective orders would protect the victims of his crimes without the need for public registration.

Although the above provides some evidence that is contrary to the trial court's finding that the interests of the public require that Billy register publicly, there is other evidence in the record that supports the trial court's finding. Robbins, Billy's juvenile probation officer who had known and worked with Billy since the case began, recommended public registration because of Billy's "significant disclosures" while at Pegasus of "having deviant sexual fantasies of . . . one of his victims" and "having deviant sexual fantasies of raping one of the Pegasus staff members while his peers at Pegasus were onlooking and cheering him on." Robbins did not believe that a person who continues to have sexually deviant thoughts has successfully completed sex-offender treatment, even though Billy had completed the programs at both Brookhaven and Pegasus. Robbins testified that she had recommended public registration fewer than ten times in the more than 100 cases that she had supervised, and the trial court could have reasonably inferred from this testimony that Robbins would not be recommending public registration in this case unless she believed it was necessary.

Moreover, LeVane's and Werner's testimony that Billy had completed the programs at their facilities came with caveats. LeVane acknowledged that Billy had not been entirely successful at Brookhaven, that "[t]o successfully complete our program does not mean the same thing as to successfully complete all of the requirements," and that Billy "was struggling with abiding by the rules of pornography" while at Brookhaven, including by using a staff member's phone to access pornography. Werner testified that Billy's fantasies of raping his cousin and a Pegasus staff member raised concerns about how Billy would do in an unsupervised environment. In her clinical discharge summary, Werner wrote that Billy "showed that he could

11

keep himself and others safe in a highly supervised environment, but it is difficult to determine if he will do so when he transitions back into the community." Although Werner testified that "public registration probably does cause stress," she acknowledged that "there's a reason for it" and that it would enable "someone to monitor him and hold him accountable until he can show how he's going to do in an unsupervised environment."

Similarly, although Dr. Graham expressed skepticism regarding the effectiveness of public registration, she also testified that "what it does is it provides a scenario where someone might be held accountable by thinking that they know that there is going to be some oversight." She also testified that "if [Billy] does not have any other means to have more treatment to help him, then public registry might allow the public to be more safe in some ways."

Additionally, Dr. Graham concluded in her psychosexual evaluation report that Billy was at a "high risk for recidivism of sexual offending and other behaviors." On the J-SOAP-II assessment tool that Graham used to evaluate Billy, he scored high on both the sex and violence scales, which indicated to Graham that "in some of his fantasies or thought processes," Billy "did include violence at times in part of his imaginings." Graham believed that "when you pair those two things together, the sexual and the violence, that's a potentially dangerous combination" that can potentially "be more dangerous to the community." The trial court could have reasonably inferred that because Billy fantasized about sexual violence and was at a high risk of re-offending, public registration was necessary to protect the community. Additionally, the trial court could have reasonably inferred that although the protective orders might provide some protection to Billy's victims, they did not provide any protection to the public at large and that to protect those who were unaware of Billy's history and proclivities, public registration was necessary.

12

We conclude on this record that the evidence is legally and factually sufficient to support the trial court's finding that the interests of the public required public registration in this case. Accordingly, we are unable to conclude that the trial court abused its discretion in requiring Billy to register publicly as a sex offender. *See In re D.K.*, 589 S.W.3d 861, 866-69 (Tex. App.—Fort Worth 2019, pet. denied); *In re L.L., Jr.*, 408 S.W.3d 383, 386-88 (Tex. App.—El Paso 2011, no pet.); *see also In re J.J.*, No. 01-22-00500-CV, 2023 WL 4937052, at *10-11 (Tex. App.—Houston [1st Dist.] Aug. 3, 2023, no pet. h.) (mem. op.) (concluding that trial court did not abuse its discretion in ordering juvenile to publicly register as sex offender and noting that "[h]ow to weigh" conflicting evidence "is a matter of the juvenile court's discretion"); *In re A.C.*, No. 03-17-00652-CV, 2018 WL 3748680, at *3-5 (Tex. App.—Austin Aug. 8, 2018, no pet.) (mem. op.) (concluding that trial court did not abuse its discretion in ordering juvenile to publicly register as sex offender when, among other reasons, juvenile's probation officer testified that juvenile presented danger to community).

We overrule Billy's sole issue.

## CONCLUSION

We affirm the trial court's order determining that Billy register publicly as a sex offender.

_____

Gisela D. Triana, Justice

Before Justices Baker, Triana, and Smith

Affirmed

Filed:   August 24, 2023